## HUNT et al. v. SEARCY et al., Appellants.

### Division One, February 19, 1902.

1. **Practice:** SELF-INVITED ERRONEOUS INSTRUCTIONS. The losing party can not complain of erroneous instructions given at his own request.

2. ———: NAME: SUFFIX "SR." The suffix "Sr." or "Jr." is no part of the name of a person.

3. ———: ———: ———: INSTRUCTION: NO EVIDENCE. If there is no evidence that the maker of a deed annexed "Sr." to his name, no instruction should be given on the point. Where there is a father and son of the same name, there is no burden on the party who claims a deed was made by the father to show that he suffixed "Sr." to his name.

4. ———: ———: IDENTITY. Identity of name is prima facie evidence of identity of person, and it devolves on him who denies the identity to overcome the presumption.

5. **Deed:** FATHER AND SON OF SAME NAME: PRESUMPTION. Where a father and son have the same name and the land belongs to the father, a deed by one of them in which the wife of the father joins, is prima facie the deed of the father.

6. ———: ———: ———: HOW OVERCOME: WORDS USED. Such presumption is not overcome by words which convey a life interest on the part of the woman and a fee simple on the part of the man, nor by the fact that the acknowledgment of the woman was not made sepa-

rate and apart from the husband as the law then required. At that time a married woman could make a deed only by joining with her husband, and the son could convey no interest in his father's land while the father lived, so that to hold the son signed the deed was to say the deed was wholly inoperative.

7. ———: VALIDITY: ESTOPPEL.  Estoppel must be pleaded to be available.

8. ———: ———: ———: COMMON SOURCE OF TITLE: LIMITATIONS.  If defendant claims title by limitation, he is not estopped from assailing a deed through which plaintiff claims as the heir of the grantee, by the fact that the grantee afterwards made conveyance to defendant.

9. Judgment: INSANITY: NOTICE.  A judgment of insanity is not void for the mere reason that the petition to have the person named therein declared insane, was pending for ten years before judgment was rendered.

10. Notice: MEANING OF LAW OF THE LAND: CONSTITUTION OF 1820. The Constitution of 1820 provided that the accused can not be "deprived of life, liberty and property, but by . . . . . the law of the land." *Held*, that the words "law of the land" meant the same thing as "due process of law," and implied notice, and this constitutional requirement made notice a necessary prerequisite to any judgment of insanity or otherwise which deprived him of either liberty or property, whether such notice was by the statute made necessary or not.

11. Judgment of Insanity: NOTICE.  A judgment of insanity without notice to the person adjudged insane and without appearance, is void, whether the statute requires such notice or not.

12. ———: ———: COLLATERAL PROCEEDING.  A judgment of insanity without notice or appearance, is not competent evidence, in ejectment, to show that the purported maker of a deed was at the date thereof insane and in ward.

13. ———: ———: BEGGING OF QUESTION.  To argue that if the defendant in an insanity proceeding is insane a notice to him would be meaningless and an idle procedure, is to beg the question; for the issue to be tried is, whether he is or is not insane, and to fail to give him notice, for this reason, is to prejudge him or forestall the very purpose of the inquest.

14. Ejectment: DEFENSE OF LIMITATIONS: GENERAL DENIAL: INSANITY. In an ordinary ejectment, where the answer pleads a general denial and the ten-year limitation, it is not competent to permit defendant to show that the deed through which plaintiff claims was voidable be-

cause made by a grantor who was insane though not in ward. Such issue was not raised by the pleadings, nor did defendant have any right to raise it.

Appeal from Ray Circuit Court.—*Hon. E. J. Broaddus,* Judge.

AFFIRMED.

*J. L. Farris & Son* for appellants.

(1) In an ejectment suit, if plaintiffs recover, it must be on the strength of their own titles. The evidence conclusively shows that Michael Turnage, Sr., was insane from 1842 to his death in 1876, and the records if admitted establish that he was judicially determined to be insane by the county court in 1852. (2) Michael Turnage, Sr., being thus declared insane was incapable of making a contract in the premises. 1 R. S. 1855, sec. 32, p. 868. (3) Having been declared insane, this disability remains until application for removal is made according to sections 39, 40 and 41, chap. 81, which was never made. 1 R. S. 1855, sec. 32, p. 869. (4) If the son of Mike Turnage signed the deed with his mother, Jemima Turnage (which is patent on the face of the deed), then it could not convey any interest he might have had in the premises, because his father, though declared insane and under legal disability, was yet living and the guardian had the control over the estate of said Michael Turnage, Sr., and for the further reason that the evidence shows that the son of Michael Turnage, Sr., and his namesake, was virtually an imbecile from his birth.

*F. B. Ellis* and *Frost & Frost* for respondents.

(1) The deed from Michael Turnage and Jemima Turnage to Jane Rowland and her bodily heirs conveyed an estate tail at common law and under our statute gave a life estate to

Jane Rowland, with a fee simple remainder to the heirs of her body. (2) Jane Rowland did not die until February, 1897, and the statute of limitations did not begin to run against the heirs until her death. Hall v. French, 165 Mo. 430. (3) (a) The deed executed on the twenty-ninth day of December, 1863, to Jane Rowland and her bodily heirs was executed by Michael Turnage, Sr., for the reason that he was the owner of the land at the time, and it will be presumed that it was the owner who executed the deed. (b) The word "senior" is a mere addition and no part of the name. Neil and Furguson, Ex., v. Dillon, 3 Mo. 59. (c) Identity of name is prima facie identity of person. Gitt v. Watson, 18 Mo. 274; Long v. McDow, 87 Mo. 197; Hoyt v. Davis, 21 Mo. App. 235. (d) The law will not notice a slight variation in spelling if the sound is practically the same. Wilkerson v. State, 13 Mo. 91; State v. Subday, 14 Mo. 417; State v. Hutson, 15 Mo. 512; Wheten v. Weaver, 93 Mo. 430. (e) Michael Turnage, Jr., at the time had no interest in the land and it is not to be presumed under such circumstances that Jemima Turnage would have joined in a deed to the land with him, or that Jane Rowland would have taken a deed from him, when she must have known that he had no title to the land. The deed must have been from Michael Turnage, Sr., for the reason that Jane Rowland and Lee Rowland, her husband, took possession under it and occupied the land without question until they deeded their interest in the same to E. P. Tiffin, the defendants' ancestor. (4) It was not error on the part of the court to exclude the record of the probate court, for the reason that such evidence was not admissible under the pleadings. (a) It was not shown or attempted to be shown whether the Michael Turnage referred to in said record was Michael Turnage, Sr., or Michael Turnage, Jr. (b) Defendants' title, consisting of the life estate of Jane Rowland, and their possession of said tract of land having come through and under deed from said Jane

Rowland, they are estopped after receiving the benefits under it to set up that their possession was adverse to others claiming a later estate in said land derived through the same deed as their grantor's interest was derived. (c) Said judgment is void and of no binding force or effect against Michael Turnage because the court was without jurisdiction of the person concerning whom said order was made for the reason that the information therein set out purporting to have been filed on August 14, 1842, would not support an inquiry had ten years after, on May 4, 1852, and no legal inquiry was had at time of filing of information. Crow v. Meyersieck, 88 Mo. 411. (d) Said judgment is void because no notice was served on Michael Turnage, and service of notice is jurisdictional and corresponds to summons in ordinary action. Crow v. Meyersieck, supra; In re Marquis, 85 Mo. 615. Where it appears of record that the court had no jurisdiction over either person or *res,* the judgment is void in a collateral proceeding. Adams v. Cowles, 95 Mo. 501; Brown v. Woody, 64 Mo. 547; Ziebold v. Trotter, 118 Mo. 349. Jurisdiction of a court of limited jurisdiction must appear on face of record. Lavender v. McCloud, 26 Mo. 65; Cunningham v. Railroad, 61 Mo. 33. If such jurisdiction does not appear of record, its acts are void. Fisher v. Davis, 27 Mo. App. 321. The records of the probate court were not admissible in evidence for the further reason that the right to avoid a contract on the grounds of insanity can only be exercised by the insane person, his guardian, or legal representatives. Even admitting that the inquest by the probate court of Ray county of the insanity of Michael Turnage is regular, yet the defendants can not plead the insanity of Michael Turnage as they are not relatives or creditors of Michael Turnage. They must have some interest in his estate in order to make this defense. Caldwell v. Ruddy, 2 Idaho 5; Atwell v. Jenkins, 40 N. E. 178; Carrier v. Sears, 86 Mass. 4.

MARSHALL, J.—Ejectment for a portion of the northwest quarter of the northeast quarter of section 17, township 53, range 28, in Ray county. The suit was begun October 17, 1898, and the ouster is laid as of the — day of February, 1897. The plaintiffs are the bodily heirs of Jane Rowland, who died in February, 1897. The defendant Searcy is the tenant in possession, under the administrators of E. P. Tiffin, and the other defendants are the heirs of E. P. Tiffin. The petition is in the usual form. The answer of Searcy disclaims any interest in the land, and sets up his tenancy. The answer of the other defendants is a general denial and a special plea of the ten-years' statute of limitations. The case was tried by the court, a jury being waived, and resulted in a verdict and judgment for the plaintiffs, from which the defendants appealed.

The plaintiffs' mother, Jane Rowland, was a daughter of Michael Turnage (or, as it seems to sometimes be spelled, Tunage) and Jemima, his wife. Michael Turnage, Sr., and Jemima his wife, had other children besides Jane Rowland, to-wit, Michael Turnage, Jr., and Sultana Turnage, who married Rube Holman, both of whom are still living. Michael Turnage, Sr., died in 1869 or 1870, or 1876 or 1877, it is not clear which. Michael Turnage, Sr., acquired the land in controversy by a deed from Robert Rockhole, the original patentee, dated March 28, 1838.

The plaintiffs claim title by virtue of the following deed:

"This indenture made this 29th day of December in the year of our Lord one thousand eight hundred and sixty-three, by and between Jemima Tunage and Michael Tunage of the county of Ray, in the State of Missouri, of the first part, and Jane Rowland, of the county of Ray, State of Missouri, of the second part, Witnesseth, that the said Jemima Tunage and Michael Tunage for and in consideration of the sum of one hundred dollars to them in hand paid, the receipt whereof is hereby acknowledged, do hereby grant, bargain, sell, convey

and confirm unto the said Jane Rowland and her bodderly heirs and assigns forever, all that piece or parcel of land situated and being in the county of Ray, in the State of Missouri, being known and designated as follows: The northwest quarter of the northeast quarter of section No. seventeen, of township fifty-three, in range twenty-eight, together with all and singular, the appurtenances thereto belonging or in anywise appertaining, to have and to hold the above described premises unto the said Jane Rowland and her bodderly heirs, and assigns forever all of their interests in said lands aforesaid, premises unto the said Jane Rowland and her bodderly heirs, and assigns, against all lawful claim or claims of all and every person whomsoever do and will warrant and forever do bind by their presents in witness whereof the said parties of the first part have hereunto set their hands and seals the day and year first above written, *the whole of the above described tract of land is not conveyed only during Jemima Tunage life time Michael part is forever conveyed to Jane Rowland and her bodderly heirs.*

her<br>
JEMIMA (X) TUNAGE.    (Seal.)<br>
mark

his<br>
MICHAEL (X) TUNAGE.    (Seal.)<br>
mark

"State of Missouri,    }<br>
  County of Ray.    }  ss.

Be it remembered that on this twenty-ninth day of December in the year of our Lord one thousand eight hundred and sixty-three, before me, R. A. Crenshaw, and acts justice of the peace within and for the county of Ray, personally appeared Jamima Tunage and Michael Tunage, who are personally known to me to be the persons whose names are subscribed to the foregoing deed as having executed the same as

parties thereto, and severally acknowledged the same to be their act and deed for the purpose therein mentioned.

"R. A. CRENSHAW, J. P.

"Taken and certified the day and year first above written.

"R. A. CRENSHAW, J. P.

"Filed for record April 25, A. D. 1866."

The claim of the plaintiffs is, that this is a deed from Michael Turnage, Sr., and Jemima his wife, and that it vested a common-law estate-tail in Jane Rowland, with a remainder in fee in the plaintiffs as her bodily heirs, and which by the statute then in force in this State vested a life estate in their mother, Jane Rowland, with a remainder in fee in them. And that their mother conveyed her life estate to E. P. Tiffin, under whom the real defendants claim, in 1872 and in 1875, and that such life estate terminated with the death of their mother in February, 1897, and then for the first time their right of action accrued, and, hence, their claim is not barred by limitation as the defendants aver in their answer.

On the other hand, the contention of the defendants is, that the deed aforesaid does not purport to be made, and was not in fact made by Michael Turnage, Sr., but on its face shows that it was made by Michael Turnage, Jr., and by Jemima Turnage during the lifetime of Michael Turnage, Sr., and hence it conveyed only the inchoate right of dower of said Jemima Turnage (under the later decisions she could convey her right to admeasurement of dower, but not a right to the possession of the land until dower was set apart to her, except by a deed in which her husband joined, Sell v. McAnaw, 138 Mo. 267; Ib. 158 Mo. l. c. 469) and the prospective right Michael Turnage, Jr., had in the land, which was at that time owned by his father; and further that if the deed was made by Michael Turnage, Sr., it was void because Michael Turnage, Sr., was at the date of the deed and had been for more than eleven years prior thereto, an insane per-

son, and in ward, having been so adjudged and placed in May, 1852; and further that the defendants' father had been in possession of the land more than twenty years, had fenced it, cultivated it, claimed it as his own, and none of the heirs of Michael Turnage, Sr., or of Jemima Turnage and no one else, had asserted any claim to it, except Michael Turnage, Jr., who at the date of the commencement of this suit was about forty-six years old, and he had never begun any action to recover it. Michael Turnage, Sr., and Jemima, his wife, and Crenshaw, the justice of the peace who took the acknowledgment, are all dead, so that there is nothing *dehors* the deed itself to show who the Michael "Tunage" who signed the deed really was.

To rebut the defendants' contention the plaintiffs claim that the proceedings adjudging Michael Turnage, Sr., insane and placing him in ward were void, because, first, the record does not affirmatively show notice to him of that proceeding; and, second, because the application for the inquiry was made in August, 1842, and the judgment was not rendered until May 4, 1852. And further, that the defendants' only title is derived from Jane Rowland, who acquired title under the deed alleged to be void, and, hence, the defendants are estopped to assert the invalidity of that deed.

The trial court evidently took this view, for it excluded the proceedings and judgment adjudging Michael Turnage, Sr., insane and placing him in ward, and instructed, that if the identity of the grantor is left in doubt the plaintiffs could not recover; that there is no presumption that Michael Turnage, Sr., executed the deed and the burden of proving that he did so, rested upon the plaintiffs and unless they so proved the judgment should be for the defendants (there was no such proof adduced or pretended to be adduced in this case) and further that if Michael Turnage, Sr., adopted the suffix "Sr." to distinguish himself from his son, Michael, the law presumes that the deed was that of the son and not that of the father and that before the plaintiffs could recover it devolved upon

them to show that the Michael Turnage who executed the deed was really Michael Turnage, Sr., and not his son Michael. As above stated there was no attempt made to overcome the presumption the instruction declared the law drew from the omission of the suffix "Sr.," and yet after so declaring and in the absence of any such proof as the instruction declared was necessary, the court found for the plaintiffs.

## I.

Instructions.

The instructions given were all wrong, because, first, there was no evidence that Michael Turnage, the father, ever adopted the suffix "Sr." to distinguish himself from his son, Michael, and therefore there was no hypothesis for the instructions to rest upon; second, the identity of name is prima facie evidence of identity of person, and it devolves upon him who denies the identity to overcome the presumption. [Long v. McDow, 87 Mo. 197; Hoyt v. Davis, 21 Mo. App. 235.] The instructions stated the converse to be the law. Third, the addition or suffix "Sr." is no part of the name of a person. [Neil v. Dillon, 3 Mo. 59.] "The abbreviations 'Jr.' and 'Sr.' are no part of the name proper." [Ency. of Pleading and Pr. (Ed. 1895), vol. 1, pp. 46-47, and great number of cases cited in note 3, where it is said: "The commonly abbreviated prefixes and suffixes are not considered either as names in themselves or as parts of names."] But as these instructions were given at defendants' request, they can not complain of the error.

## II.

Deed, and Title, and constitutionality of statutes dispensing with notice to persons in inquests as to their sanity.

The deed in question, prima facie, is the deed of Michael Turnage, the father, and it devolved upon the defendants to

overcome this presumption. This the defendants claim to have successfully done in two ways: first, by recitals of the deed itself, and by the acknowledgment; and, second, by showing that at the time it was executed Michael Turnage was insane and in ward, and therefore the deed is void, and being void and not merely voidable, it is open to attack in this collateral proceeding.

The gist of the first contention is found in the concluding words of the deed: "The whole of the above described tract of land is not conveyed only during Jemima Tunage life time Michael part is forever conveyed to Jane Rowland and her bodderly heirs," and in the fact that the acknowledgment does not describe Jemima as the wife of Michael, and it is not in the form prescribed by sections 38 and 39 of chapter 32, pp. 225-6, Revised Statutes 1845, which required the certificate to show that the married woman was made acquainted with the contents of the conveyance, and that she acknowledged, on an examination, apart from her husband, that she executed the same, freely, and without compulsion or undue influence of her husband.

But if all this be conceded it would not be sufficient to overcome the presumption that it was the deed of Michael Turnage, the father. It would show only that the deed was void as to Jemima, because it was not properly acknowledged, but it would remain a good deed as to Michael. It is insisted, however, that as Michael owned the whole estate, the recital, "Michael *part* is forever conveyed to Jane Rowland," etc., would not have been used if it was Michael, the father, who executed it, and the term "Michael *part*" shows it was the son Michael, who executed it. The whole expression must be read together, and when so read it purports to convey the whole tract during the life of Jemima and Michael's part forever; thus conveying the idea that Jemima had some interest in the land as distinguished from the interest of her husband. As above shown, Jemima had only an inchoate right of dower,

which was incapable of alienation, except by a deed in which her husband joined. [Sell v. McAnaw, supra.] The draughtsman of the deed may have conceived that she had an interest which she could convey, without her husband joining in the deed, and therefore he distinguished between the whole estate in which husband and wife had an interest, and the *part* thereof which the husband could convey without his wife joining in the deed. This is just as reasonable a construction to place upon the words employed, as that contended for by the defendants, for if their contention be correct, the wife conveyed nothing and the son conveyed nothing—the wife, because the conveyance was not acknowledged as the law required, and the son, because he had no interest to convey, the land being his father's, and he being still alive. This, therefore, is not a substantial fact sufficient to overcome the prima facie presumption that the deed was made by Michael Turnage, the father. All the parties and the justice of the peace are dead, the original deed was not introduced, because not found, and a certified copy only was in evidence. But as the deed was signed by a mark and not in the handwriting of the grantors, it is not easy to see how even the original deed could show whether it was the father or son who signed it. Especially as the evidence does not show that either one of them could read or write.

The second contention, to-wit, that Michael, the father, was insane and in ward, when the deed was made, and hence the deed is void, is most serious and worthy of consideration. The plaintiffs' contention that the defendants derive title under that deed, through Jane Rowland, and hence are estopped to plead that the deed is void, is untenable. The claim pleaded in the answer is title by limitation. The evidence they introduced was to support this claim. Plaintiffs, however, have set out in their brief three deeds from Jane Rowland to E. P. Tiffin, the defendants' ancestor. The abstract of the record (and, in fact the complete transcript of the record) does

not show that any such deeds were introduced in evidence. But if they had been, they would not estop the defendants from assailing the validity of the deed: first, because no such estoppel was pleaded; second, because the defendants do not claim under them, but by limitation; and, third, if they were made *after* her father's death (they were made in 1872 and 1875, and there is some doubt whether Michael died in 1869, 1870, 1876 or 1877) those deeds were sufficient to convey Jane's interest in the property to Tiffin, and, therefore, if the deed of Michael and Jemima to her is void, Jane owned a third interest in the land, which having been conveyed by her to the defendants' ancestor, cut out the rights of the plaintiffs, her children.

In other words, the plaintiffs must recover upon the strength of their own title and not upon the weakness of the defendants', and their right to recover depends upon the validity of the deed in question, from her father and mother conveying a life estate to their mother with a remainder in fee to them.

The pivotal question in this case therefore is, was that deed void. There is no doubt that on May 4, 1852, Michael Turnage was adjudged insane, and placed in ward, and so remained during his life. The deed in question was made on December 29, 1863, more than eleven years after such adjudication of insanity.

The trial court excluded the record of such adjudication upon the ground that it was immaterial, that is, it adopted the plaintiffs' contention that the defendants claim under that deed through Jane Rowland and, hence, are estopped to claim that it is invalid, but as shown, that is untenable. The plaintiffs now contend further that that adjudication is void, because the petition therefor was filed in 1842 and the adjudication was in 1852, and because it does not affirmatively appear that Michael had notice of the inquiry into his sanity which resulted in that adjudication. The fact that the peti-

tion to declare Michael insane was pending for ten years before the judgment was rendered does not of itself invalidate the judgment.    Some cases have been known to remain pending in court even longer than ten years.    Even a motion for new trial was pending for fourteen years (St. Francis Mill Co. v. Sugg, 142 Mo. 364), and it was held that during the pendency thereof the case was in the breast of the court. And exceptions to a referee's report were pending for over six years.    [Estes v. Fry, 166 Mo. 70.] In short, the court does not lose jurisdiction as long as the case is pending.  Hence, the adjudication in question is not invalid because the petition for judgment had been pending in court for ten years.

This leaves only the question whether the adjudication was void because the record does not affirmatively show that Michael Turnage was notified of the proceeding.

At the date of the petition, in 1842, the statutes (sec. 2, title "Insane Persons," R. S. 1835, p. 323), provided that when information in writing was given to the county court that any person in their county was of unsound mind, and praying that an inquiry be had, the court, if satisfied that there was good cause for the exercise of its jurisdiction, "shall cause the person alleged to be insane to be brought before such court, and inquire into the facts by jury."

At the time the judgment was rendered, in 1842, this provision had been changed so as to provide:   "In proceedings under this act, the county court may, *in its discretion,* cause the person alleged to be of unsound mind to be brought before the court."    [R. S. 1845, chap. 85, sec. 3, p. 593, title "Insane Persons."]   This provision was re-enacted by the revision of 1855 (R. S. 1855, chap. 81, sec. 3, p. 864) and by the revision of 1865 (G. S. 1865, chap. 40, sec. 3, p. 235).    The revision of 1879, provided:   "In proceedings under this chapter, the alleged insane person must be notified of the proceeding, unless the probate court order such person to be brought before the court, or spread upon its record

of the proceedings the reason why such notice or attendance was not required." [R. S. 1879, chap. 116, sec. 5789, p. 1133.] This provision was carried into the revision of 1889 (R. S. 1889, chap. 86, sec. 5515), and is the same in the revision of 1899. [R. S. 1899, chap. 39, sec. 3652.]

The case of Dutcher v. Hill, 29 Mo. 271, arose under the statute of 1855, which vested the court with a discretion to bring.in the alleged insane person, and the court, per SCOTT, J., said: "Whether this provision is a substitute for the notice and was designed to leave it to the discretion of the court whether the alleged lunatic should have notice and should be present at the making of the inquisition, we will not determine, as on any construction of the statute we are of opinion that it should appear from the proceedings why the notice was not given, or the attendance of the person of unsound mind required. On general principles, persons should have notice of proceedings in courts by which their rights are to be affected, otherwise those proceedings will not bind them. Judgments rendered without notice are not binding. If the irregularity of these proceedings had been questioned in a direct proceeding, no doubt it would have been corrected; but after considerable examination we have not been able to find a single case in which it has been held that the validity of a sale of the land of a supposed lunatic made by his guardian can be attacked in a collateral proceeding on the ground of the want of notice of taking the inquisition by which the supposed lunatic was found to be such. The cases of Willis v. Willis, 12 Pa. St. 159, and Bethea v. McLemon, 1 Iredell 523, on the contrary, maintain that the want of such notice can not be taken advantage of in a collateral action."

The case of In re Marquis, 85 Mo. 615, arose under the revision of 1879. There was no notice to the person alleged to be of unsound mind, but the court spread upon the records this order: "Now, at this day, comes Lafayette Marquis and files information that Washington Marquis is a person of

unsound mind, and upon proof that he is not in condition of mind and body to be brought into court, it is ordered that he be not brought into court." Upon this an ex parte trial was had and he was adjudged insane and was placed in ward. The thus adjudged insane man found out that he had been adjudged *civiliter mortuus,* and at the next term of court he appeared and moved to set aside the judgment on the ground that he had not been notified and that he was not insane. The court sustained the motion and set aside the judgment. Thereupon the guardian appealed, and argued that as the term of court at which the judgment was rendered had lapsed before the motion to set aside the judgment was filed the court was without jurisdiction to set the judgment aside. This court held, however, that the proceedings were still *in fieri,* and hence the court had power to correct *"irregularities"* in the judgment, and that the statement in the order that was spread upon the records that the alleged insane person was not in condition of mind and body to be brought into court, was not a sufficient reason for not giving him notice, although it might be sufficient reason for not bringing him into court. So, for the "irregularities" of not giving him notice, the conviction of insanity was set aside.

Crow v. Meyersieck, 88 Mo. 411, also arose under the revision of 1879. It was an action for damages for depriving the plaintiff of his liberty and property, by confining him in an insane asylum and selling his personal property. The answer of the defendant was a judgment of the probate court adjudging the plaintiff insane and appointing defendant his guardian. The reply was, the judgment of the probate court was void for want of jurisdiction over the person of the plaintiff. The record of the probate court recited that "due notice of the application for an inquiry into the mental condition of the appellant [plaintiff] had been given and the appearance of the parties," etc. The plaintiff, however, proved that the notice was served on him June 13, 1881, and stated that

the inquiry would be held on January 21, 1881. In fact the hearing was had and the judgment entered on June 13, 1881. The court held that the recital of notice in the judgment, while ordinarily sufficient, was in this case insufficient, because the notice itself contradicted the recital, and that such notice "corresponds to the summons in ordinary actions, and like the latter, forms a part of the record proper." But it was further held that as the judgment recited the appearance of the parties, it cured the failure to give notice and made the judgment voidable only, and not void, and hence the judgment of nonsuit was affirmed.

Coleman v. Farrar, 112 Mo. 54, was a controversy between the guardian and the administrator of one Ashby. It appeared that "without notice to said Ashby, and without bringing him before the court, for the reason that he was a raving maniac at the time, an inquiry was had before a jury" and Ashby was adjudged insane and his father-in-law was appointed his guardian. "After the inquiry Ashby was taken to the asylum, where he remained but a short time, and upon being discharged he returned home and resumed control of his business." The guardian never qualified or entered upon his duties. Ashby killed his father-in-law and the plaintiff was appointed his guardian, and qualified. In the meantime Ashby had contracted debts, which the guardian paid. Then Ashby died and the defendant was appointed as his administrator. The administrator claimed that the guardian should not be allowed credit for such payments, as they were upon contracts that were void. The credits were disallowed. Among other points that the guardian seems to have raised was that the appointment was void, presumably though not expressly so stated, for want of notice. At any rate it was held that as the guardian accepted appointment under that judgment he was estopped to deny its validity. This is all that case decides that is material to the case at bar.

Bell v. Brinkmann, 123 Mo. 270, was an action in eject-

ment to recover property acquired by defendant through a sale in a partition suit. The plaintiff was made a party to the partition suit but was not served either personally or by publication. The record recited that the parties appeared, however. It was held that such a recital was not conclusive evidence that the plaintiff appeared, and hence he was not bound by the judgment in partition. Crow v. Meyersieck, 88 Mo. 411, wherein such a recital was held to cure want of notice, was referred to, and of that case it was said (l. c. 278): "It is also to be remembered that in that proceeding the law requires that 'the alleged insane person must be notified of the proceeding, unless the probate court order such person to be brought before the court, or spread upon the record of its proceedings the reason why such notice or attendance was not required.' 2 R. S. 1889, sec. 5515. So that a recital of appearance in such a case has a special probative force not analogous to a general recital in an ordinary proceeding."

Kiehne v. Wessell, 53 Mo. App. 667, was a suit on a promissory note. The guardian of the defendant pleaded that the note was void because the maker was in ward when it was executed, and offered the record adjudging him insane and placing him in ward in evidence. The trial court held the judgment conclusive and excluded testimony offered by the plaintiff to rebut the insanity. The record showed such adjudication. "It did not appear by this record that the inquiry of lunacy was had before a jury, or that the defendant was notified thereof, or that he was present in court. Nor did the record show why such notice or attendance was not required." The St. Louis Court of Appeals said: "The objections as to notice were sufficient to show that the proceedings were *irregular*, and the inquiry could have been vacated for that reason by the alleged lunatic. [Dutcher v. Hill, 29 Mo. 271; In re Marquis, 85 Mo. 615; Crow v. Meyersieck, 88 Mo. 411.] The fact, however, that the inquiry was held by the court and not by a jury, rendered the proceeding *coram*

*non judice* and void." So it was held error to admit the record. But this error was also held to be harmless because another record was introduced in evidence showing that afterwards an inquiry as to whether the lunatic had regained his sanity resulted in a verdict that he was insane, and this record was held "sufficient to establish an adjudication of lunacy." Thus a void judgment was given full effect by a later adjudication that the person "is insane," and the acts of the person in the interim between the two inquiries and judgments were held to be void.

These cases are collated and reviewed to show that in no instance reported in any of the cases that have come before this court, has the alleged lunatic been notified of the proceedings had to adjudge him insane, except in Crow v. Myersieck, supra, and there the notice was held to be no notice at all. The failure to give such notice is called a simple "irregularity," which entitled the lunatic to have the adjudication set aside at any time, the proceeding being always *in fieri*, but not sufficient to vitiate the judgment or subject it to collateral attack. Yet all the time it has been said that a judgment rendered without notice to the person against whom it was rendered is *void*—not merely voidable. It has also been held that a recital in such a judgment that "the parties appeared" is conclusive, unless the attempted notice, which is held to have the force of a summons and is therefore a part of the record, shows he was not notified or summoned, while such a recital in a judgment against a sane person is held not to be conclusive. It has also been held that an order spread upon the records that the alleged lunatic was not in a condition of mind or body to be brought into court, did not justify or excuse a failure to give him notice, when the alleged lunatic himself made the objection, and all of these rulings have been based upon the assumption that the statutes authorized such proceedings and that such statutes were constitutional.

It must also be borne in mind that the statutes of 1835

required notice, that is, required the person to be brought into court. The statutes of 1845 said nothing about notice but vested a discretion in the court to order the alleged lunatic to be "brought before the court" or not, and such was the statutory provision until 1879, when the law was changed so as to require such a notice, "unless the probate court order such person to be brought before the court, or spread upon its record of the proceedings the reason why such notice or attendance was not required." And this has been the provision of the statutes ever since.

In none of these cases has the constitutionality of the statute been questioned. This is most surprising in view of the fact that section 9 of article 13 of the Constitution of 1820, provided that, "In all criminal prosecutions, the accused has the right to be heard by himself or his counsel; to demand the nature and cause of the accusation; to have compulsory process for witnesses in his favor; to meet the witnesses against him face to face, and, in prosecutions or presentment or indictment, to a speedy trial by an impartial jury of the vicinage; that the accused can not be compelled to give evidence himself, nor be deprived of life, liberty, or property, but by the judgment of his peers or the law of the land."

The Constitution of 1865 contained the same provision, section 18, article 1.

The Constitution of 1875 divided up these provisions into three sections. Section 22 of article 2, contains all of the provision down to a trial by a jury, substituting the word "county" for the word "vicinage." Section 23 contains the provision, "that the accused can not be compelled to testify against himself," adding "in a criminal case," and then adds substantially the provisions of section 19 of article 1 of the Constitution of 1865. And section 30, article 2, Constitution 1875, is: "No person shall be deprived of lfe, liberty or property without due process of law." This is the same as the

Vol 167 mo—12

last provision of section 9, article 13, Constitution 1820, and section 18, article 1, Constitution 1865, except that it reads, "without due process of law," while the former constitutions read, "but by the judgment of his peers, or the law of the land."

Conceding that until the adoption of the Constitution of 1875 this provision only related to criminal proceedings, which would be a surprising construction to the framers of the Constitutions of 1820 and 1865, and that for the first time by the Constitution of 1875 the provision was extended so as to cover civil as well as criminal proceedings, it is remarkable that the constitutionality of the statute which allows a person to be adjudged a lunatic, deprived of liberty and his property, without notice, should not have been questioned. Some of the cases cited show clearly that the judges writing the opinions had such an idea lurking in their minds and struggling for expression. This is particularly true as to the case of In re Marquis, 85 Mo. l. c. 618, where NORTON, J., said that while the order reciting that the alleged lunatic was not brought into court because he was not in condition of body or mind to be brought into court, was sufficient reason for not bringing his body into court, it was no excuse for not giving him notice.

In Jones v. Yore, 142 Mo. 38, an allowance of fees to a guardian *ad litem*, without notice to the minor, was held to violate section 30 of article 2, Constitution 1875, and to be without due process of law." In that case BURGESS, J., said: "'Due process of law' and 'law of the land' are synonymous terms, and mean the same. There are many definitions of 'due process of law,' which, while differing in the language used, do not differ in their scope and meaning. 'The better and larger definition of due process of law,' says Chancellor KENT (2 Kent's Com., 13), 'is that it means law in the regular course of administration through courts of justice.' In Bertholf v. O'Reilly, 74 N. Y. 519, it was said: 'In judicial proceedings, due process of law requires notice, hearing and

judgment.' See, also, People ex rel. Witherbee v. Supervisors, 70 N. Y. 228. Mr. Justice COOLEY, in his work on Constitutional Limitations (6 Ed.), p. 491, says: 'Individual citizens require protection against judicial action as well as against legislative; and perhaps the question, what constitutes due process of law? arises as often when judicial action is in question as in any other cases. . . . . The proceedings in any court are void if it wants jurisdiction of the case in which it has assumed to act. Jurisdiction is, first, of the subject-matter, and, second, of the person whose rights are to be passed upon. A court has jurisdiction of any subject-matter if, by the law of its organization, it has authority to take cognizance of, try and determine cases of that description. If it assumes to act in a case over which the law does not give it authority, the proceeding and judgment will be altogether void, and rights and property can not be divested by means of them. The same author says, page 431: 'Perhaps no definition is more often quoted than that given by Mr. Webster in the Dartmouth College case' (4 Wheat. 518): "By 'the law of the land' is most clearly meant the general law; a law which hears before it condemns; which proceeds upon inquiry and renders judgment only after trial. The meaning is that every citizen shall hold his life, liberty, property and immunities, under the protection of the general rules which govern society." ' Clark v. Mitchell, 64 Mo. 564."

In State v. Julow, 129 Mo. l. c. 174, SHERWOOD, J., said: "The 'law of the land' and 'due process of law' are the legal equivalents of each other. Touching this topic, a distinguished jurist observes: 'Perhaps no definition is more often quoted than that given by Mr. Webster in the Dartmouth College case: "By the law of the land is most clearly intended the general law; a law which hears before it condemns; which proceeds upon inquiry, and renders judgment only after a trial. The meaning is that every citizen shall hold his life, liberty, property, and immunities, under the general rules

which govern society. Everything which may pass under the form of an enactment is not therefore to be considered the law of the land." ' Cooley, Const. Lim. (6 Ed.) 431."

In Hennig v. Staed, 138 Mo. l. c. 434, MACFARLANE, J., said: "Undoubtedly, no one can be deprived of his property without an opportunity to be heard. This principle is fundamental, and the declaration in the Constitution to that effect is a mere authoritative recognition of it. Taking the property of an employer to pay the claims of his employees upon their mere sworn statement, without notice and without giving him an opportunity to contest their correctness, would certainly be taking his property without due process."

"Due process of law" implies and requires notice. And any enactment which authorizes a person to be deprived of life, liberty, or property without notice and an opportunity to be heard, though passed in the form of an enactment is not due process of law or the law of the land. [State v. Loomis, 115 Mo. l. c. 312, 313; Roth v. Gabbert, 123 Mo. l. c. 29.]

The most illustrative case bearing upon the injustice that may be done by a judicial proceeding, without notice, is that of Scott v. McNeal, 154 U. S. 34. That was a suit in ejectment. The facts showed that in March, 1881, the plaintiff mysteriously disappeared and nothing was heard of him and he was believed to be dead until July, 1891, when he returned. In 1888, on the presumption that he was dead, letters of administration were granted, and his estate was administered upon and the land in question sold. When he returned he sued the purchaser for the land. The courts of the State of Washington held that the proceedings in administration were conclusive—that he was dead—and directed a verdict for the defendant. The plaintiff took the case to the Supreme Court of the United States, where the judgment below was reversed. Mr. Justice GRAY delivered the opinion of the court and, *inter alia*, said: "The Fourteenth Article of Amendment of the Constitution of the United States, after other provisions which

do not touch this case, ordains, 'nor shall any State deprive any person of life, liberty, or property without due process of law, nor deny to any person within its jurisdiction the equal protection of the laws.' These prohibitions extend to all acts of the State, whether through its legislative, its executive, or its judicial authorities. [Virginia v. Rives, 100 U. S. 313, 318, 319; Ex parte Virginia, 100 U. S. 339, 346; Neal v. Delaware, 103 U. S. 370, 397.] And the first one, as said by Chief Justice WAITE, in United States v. Cruikshank, 92 U. S. 542, 554, repeating the words of Mr. Justice JOHNSON, in Bank of Columbia v. Okely, 4 Wheat. 235, 244, was intended 'to secure the individual from the arbitrary exercise of the powers of government, unrestrained by the established principles of private rights and distributive justice.' Upon a writ of error to review the judgment of the highest court of a State upon the ground that the judgment was against a right claimed under the Constitution of the United States, this court is no more bound by that court's construction of a statute of the Territory, or of the State, when the question is whether the statute provided for the notice required to constitute due process of law, than when the question is whether the statute created a contract which has been impaired by a subsequent law of the State, or whether the original liability created by the statute was such that a judgment upon it has not been given due faith and credit in the courts of another State. In every such case, this court must decide for itself the true construction of the statute. [Huntington v. Attrill, 146 U. S. 657, 683, 684; Mobile & Ohio Railroad v. Tennessee, 153 U. S. 486, 492-495.] No judgment of a court is due process of law, if rendered without jurisdiction in the court, or without notice to the party. The words 'due process of law,' when applied to judicial proceedings, as was said by Mr. Justice FIELD, speaking for this court, 'mean a course of legal proceedings according to those rules and principles which have been established in our system of jurisprudence for the protection and enforce-

ment of private rights.   To give such proceedings any validity, there must be a tribunal competent by its Constitution—that is, by the law of its creation—to pass upon the subject-matter of the suit; and, if that involves merely a determination of the personal liability of the defendant, he must be brought within its jurisdiction by service of process within the State, or his voluntary appearance.' [Pennoyer v. Neff, 95 U. S. 714, 733.]   Even a judgment in proceedings strictly *in rem* binds only those who could have made themselves parties to the proceedings, and who had notice, either actually, or by the thing condemned being first seized into the custody of the court. [The Mary, 9 Cranch, 126, 144; Hollingsworth v. Barbour, 4 Pet. 466, 475; Pennoyer v. Neff, 95 U. S. 714, 727.] And such a judgment is wholly void, if a fact essential to the jurisdiction of the court did not exist."

It only remains to apply these principles to the statute and the case at bar.   The statute of 1845 is silent as to notice and only gave the court a discretion as to requiring the body of the alleged lunatic to be brought into court, which was held in the case of In re Marquis, supra, not to dispense with notice.   The statute of 1879 requires notice unless the person is brought into court or a reason for not notifying him or for not bringing his body into court is spread upon the records of the proceedings.

It is too clear for argument that this qualification and attempted authority for depriving the accused of his liberty or property without notice violates both the State and Federal Constitutions, and does not constitute "due process of law."

But one reason can be suggested for not serving the person to be tried with notice, and that is, that as he is insane, a notice to him would be useless and meaningless.   This argument begs the question; for the issue to be tried is whether he is insane or not, and to fail to give him notice, for this reason, is to forestall the very purpose of the inquest.   But even if he be a raving maniac, he can appear by attorney or through his

friends, and see that a proper person is appointed guardian or
that a proper care is given to his property and to his person.
In addition, what if the person was not really insane at all,
and without notice was adjudged insane and confined in an
asylum and the management of his property given to another?
In such contingency the propriety of notice would be manifest,
and if given would defeat the recovery of a judgment.  It will
not do to say that in the fifty-seven years that these provisions,
not requiring notice, have been on the statute books no instance
is recorded of any sane person being so adjudged and deprived
of his liberty or property, and that instances of such outrages
are found only in highly-colored and improbable stories in
works of fiction.   For the Marquis case is an instance in our
own reports where a citizen was so adjudged insane, without
notice, and at the very next term of court appeared and proved
that he was not and never was insane.   But however the past
experience may have been, the fact remains that the possibility
of such an outrage being perpetrated is afforded by the statu-
tory provisions referred to, and it is the duty of the courts,
whenever the question arises, to prevent the happening of such
a wrong, by declaring those provisions to be unconstitutional.

In the case at bar, the record of the county court adjudg-
ing Michael Turnage insane and placing him in ward in May,
1852, not only wholly fails to show that he was notified in any
way of that proceeding, and that no reason was spread on the
record for not bringing his body before the court, but it also
wholly fails to show that after qualifying, the guardian did
anything whatever.   The evidence shows that the so adjudged
lunatic continued to enjoy his liberty, to come and go without
let or hindrance, and to use and cultivate his property.   In
short, there is not a word of evidence, record or parol, to show
that he ever knew he had been adjudged legally dead, during
the eighteen or more years that he lived after the judgment of
insanity was entered against him.   It would be a travesty
upon justice, worthy to be dramatized, to hold that a sane man

is entitled to notice before his liberty or property can be taken from him, but that this can be done in a probate court in a proceeding to declare the person, so to be treated, to be insane, or to declare that the protection of the Constitution does not extend to a person who is *charged* to be insane, and that upon such an ex parte charge, in an ex parte proceeding, his liberty and property can be taken away from him.

The judgment of the county court offered in evidence in this case was absolutely void and was properly excluded. The evidence offered by the defendants, to show that the deed to Jane Rowland was voidable because Michael Turnage was insane, although not in ward, was also properly excluded, because the defendants neither raised nor had any right to raise such an issue.

It follows that the deed to Jane Rowland vested a life estate in her and a remainder in fee in the plaintiffs, the heirs of her body, and that the plaintiffs' right to the possession and right of action did not accrue until her death in February, 1897, and as this action was begun on the seventeenth of October, 1898, their cause of action is not barred by limitation. [Hall v. French, 165 Mo. 430.] It also follows that the defendants have not acquired title by limitation.

For these reasons the judgment of the circuit court is affirmed. All concur.