HAMMON v. HILL, Superintendent of Allegheny County Home and Hospital for Insane.

(District Court, W. D. Pennsylvania. October 29, 1915.)

No. 3.

CONSTITUTIONAL LAW &⇒255—INSANE PERSONS &⇒47—COMMITMENT TO ASYLUM—CONSTITUTIONALITY OF STATUTE.

Act Pa. May 8, 1883 (P. L. 21), which with prior acts provides a system adopted by the state for the care and treatment of insane persons, is not unconstitutional, as depriving persons of their liberty without due process of law, because it authorizes the confinement of insane persons without a previous trial, since it also provides that any person confined as insane shall be entitled to a judicial hearing on a writ of habeas corpus to determine the question of his sanity.

[Ed. Note.—For other cases, see Constitutional Law, Cent. Dig. §§ 736–738, 740–745; Dec. Dig. &⇒255; Insane Persons, Cent. Dig. § 74; Dec. Dig. &⇒47.]

Petition for writ of habeas corpus by John Hammon, Sr., against D. R. Hill, Superintendent of the Allegheny County Home and Hospital for the Insane. Writ denied.

J. E. Little, of Pittsburgh, Pa., for petitioner.
Langfitt & McIntosh, of Pittsburgh, Pa., for respondent.

THOMSON, District Judge. The relator, John Hammon, Sr., asks for a writ of habeas corpus, alleging his illegal confinement in the Allegheny County Home and Hospital for the Insane, in violation of his rights under the Constitution of the United States. Whether the court should grant or refuse the writ, under section 755 of the Revised Statutes (Comp. St. 1913, § 1283), depends in this as in every other case upon the facts as set forth in the petition.

Turning to the petition, we find it alleges: That petitioner is confined and restrained of his liberty by virtue of a certain paper purporting to be a commitment committing relator to said asylum as an insane person, and that the sole authority by virtue of which relator is restrained and detained is the said commitment in writing, a copy of which is attached to and made part of the petition. That the said commitment was issued in a proceeding arising as follows:

On or about the 14th of August, 1913, one Anna M. Hammon, daughter of the relator, requested Dr. J. Lewis Srodes, the then superintendent of the said asylum, to receive relator, an insane person, as a patient in said hospital, expressing her belief that such attention was necessary for his benefit, which request was afterwards reduced to writing. That about the same time the relator was invited, while in Garrick, to take an automobile ride, which invitation he accepted, and that he was taken to the said asylum at Woodville, Allegheny county, Pa., where he has been since and is now forcibly restrained of his liberty. That according to the paper purporting to be a commitment on file in the office of the superintendent of said asylum, and under color of which he is restrained of his liberty, Drs. S. J. S. Fife and E. N. Husler, on the 14th and 15th days of August, 1913, respectively cer-

tified under oath that in their opinion the relator was insane; that the disease was of a character which required that he be placed in a hospital or other establishment where the insane are detained, for care and treatment. That thereupon one A. W. McMillen, a justice of the peace of the county of Allegheny, certified in the same paper, Exhibit A, that the said physicians had duly made oath to their certificate of insanity of the relator, and that their signatures thereto were genuine, and the signers physicians of good standing and repute, and that thereupon J. McB. Robb, a director of the poor of Allegheny county, ordered Dr. J. Lewis Srodes, superintendent of the said asylum, to admit relator as an insane person to the hospital.

He alleges that the act approved May 8, 1883 (P. L. 21), under which he was committed, violates the Fourteenth Amendment of the Constitution of the United States, in that he is restrained of his liberty without due process of law; that he was tricked into the asylum, examined without notice of the proceeding, and without a hearing or chance to defend, and has been incarcerated in the asylum for two years and upwards to the present time; that the said act is unconstitutional and void; that he is not committed or detained by virtue of any process of law known to the courts of the United States, or the several states, nor held in confinement by virtue of any final judgment or decree of any competent court or tribunal, or by virtue of any process issued upon such judgment, but is held without due process of law.

It thus appears that the relator is confined in an asylum for the insane, under the provisions of an act of assembly of Pennsylvania passed for the care and treatment of the insane. It is not averred in the petition that the relator was sane at the time of his commitment or at the time of the filing of the petition for the writ. On the contrary, the amendment to the petition avers that on August 27, 1913, one Chas. J. Speas, on behalf of petitioner, obtained a writ of habeas corpus under the said act of 1883 for the petitioner's discharge, and that on hearing the relator was found to be insane and remanded to the asylum. The petitioner, therefore, bases his right to discharge, notwithstanding his insanity, or presumptive insanity, on the unconstitutionality of the act under which he was committed, and that therefore he is restrained of his liberty without due process of law. A state would indeed be derelict of its duty if it failed to make adequate provision for the care and treatment of the insane. The state is the parens patriæ of the insane. In the case of Mormon Church v. United States, 136 U. S. 57, 10 Sup. Ct. 792, 34 L. Ed. 478, the Supreme Court, through Justice Bradley, quotes from Fontain v. Ravenel, 17 How. 369, 15 L. Ed. 80, as follows:

"When this country achieved its independence, the prerogatives of the crown devolved upon the people of the states. And this power still remains with them, except so far as they have delegated a portion of it to the federal government. The sovereign will is made known to us by legislative enactment. The state, as a sovereign, is the parens patriæ."

The court then says:

"This prerogative of parens patriæ is inherent in the supreme power of every state, whether that power is lodged in a royal person or in the Legisla-

ture, and has no affinity to those arbitrary powers which are sometimes exerted by irresponsible monarchs to the great detriment of the people and the destruction of their liberties. On the contrary, it is a most beneficent function, and often necessary to be exercised in the interests of humanity, and for the prevention of injury to those who cannot protect themselves."

Nothing can be clearer than the duty of the state to restrain and confine the insane, not only for their own safety and protection, but for the safety and protection of the public. The relation between the two is that of guardian and ward. The confinement in an asylum is not of the same character as imprisonment for the punishment of an offense. It is a necessity growing out of the inability of the mentally afflicted to care for themselves or prevent injury to others. The state restrains the lunatic, not only for his own protection and the safety of the public, but its duty extends so far as to include every provision known to medical skill and science for the treatment of the diseased mind. Thus the work of the state in caring for the demented within her borders is at once protective in its character and highly humanitarian.

It is also true that, by reason of the character of the malady with which the insane is afflicted, the same course of procedure cannot be employed for their restraint, as in the case of those who are compos mentis. Notice or a hearing to the insane man is a vain thing, and frequently the exigency of the case is such as to call for immediate restraint to protect himself and others from his violent and unreasoning conduct. In 8 Cyc. 1093, the author says:

"A person's insanity justifies his arrest without legal process, but only where it is reasonably necessary; and an insane person may be confined, provided there are provisions for judicial investigations and determination of the question of sanity, with an opportunity given to him to be heard"—citing numerous cases.

Judge Cooley, in his work on Torts (page 179), says:

"An insane person, without any adjudication, may also lawfully be restrained of his liberty for his own benefit, either because it is necessary to protect him against a tendency to commit suicide, or to stray from those who would care for him, or because proper medical treatment requires it."

In Chevannes v. Priestly, 80 Iowa, 316, 45 N. W. 766, 9 L. R. A. 193, the court held that:

"The provision of the Constitution, that 'no person shall be deprived of life, liberty or property without due process of law,' does not require notice to a person, or his appearance, before he can be lawfully adjudged insane and restrained accordingly."

In this case the proceeding was under the act of May 8, 1883 (P. L. 21). There is no allegation that the course of procedure laid down in that act was not strictly complied with. This act is one of a number of acts forming part of the system adopted by the state for the care and treatment of the insane. Section 3 of the act of 1869 (P. L. 79), provides as follows:

"On a written statement, properly sworn or affirmed, being addressed by some respectable person to any law judge, that a certain person then confined in a hospital for the insane, is not insane, and is thus unjustly deprived of his liberty, the judge shall issue a writ of habeas corpus, commanding that the

said·alleged lunatic be brought before him for a public hearing, where the question of his or her alleged lunacy may be determined, and where the onus of proving the said alleged lunatic to be insane shall rest upon such persons as are restraining him or her of his or her liberty."

.This provision of the act is still in force. Section 11 of the same act provides:

"That nothing in this act shall be construed so as to deprive any alleged lunatic or habitual drunkard of the benefit of the writ of habeas corpus, or trial by jury, or any other remedy guaranteed to alleged lunatics or habitual drunkards by any existing laws or statutes of the commonwealth of Pennsylvania."

The act of 1883, above referred to, supplements the act of 1869, superseding certain of its sections, and it also gives judicial investigations and determination of the question of sanity, with a right to be heard. Section 31 provides:

"All persons that have been detained as insane (other than criminal insane, duly convicted and sentenced by a court) shall, as soon as they are restored to reason and are competent to act for themselves, in the opinion of the medical attendant of the house, be forthwith discharged; and any person so detained, shall, at all times, be entitled to a writ of habeas corpus for the determination of this question, and on the hearing, the respondent in that writ shall be required to pay the costs, and charges of the proceeding, unless the judge shall certify that there was sufficient ground, in his opinion, to warrant the detention, and put the petitioner to his writ; in case the discharged patient be in indigent circumstances, such person shall be furnished with necessary raiment, and with funds sufficient for sustenance and travel to his home, to be charged to the county from which such patient was committed."

Similar acts in other states have been sustained as constitutional. In re James Dowdell, 169 Mass. 387, 47 N. E. 1033, 61 Am. St. Rep. 290; In re Le Donne, 173 Mass. 550, 54 N. E. 244; Ex parte Dagley, 35 Okl. 180, 128 Pac. 699, 44 L. R. A. (N. S.) 389; People ex rel. Peabody v. Chanler, 133 App. Div. 163, 117 N. Y. Supp. 322.

It appearing, therefore, that the petitioner is restrained and confined in an asylum for the care and treatment of the insane under and in accordance with the provisions of an act of assembly of the state of Pennsylvania; that this act is one of a number of acts constituting a system adopted by the state for the care of her insane; that the act under which relator was committed, or the act to which it is supplementary has not been declared unconstitutional, or in any respect illegal by the courts of Pennsylvania; that these acts provide a method by which the sanity of the relator can at any time be judicially determined on his application; that it is not even alleged that at the time of his commitment, or at the present time, he is sane, and it appearing that his insanity was adjudged by a court of competent jurisdiction upon a hearing upon a writ of habeas corpus sued out under the act of 1883, I conclude that the relator is not restrained in violation of any right guaranteed to him under the Constitution of the United States.

The writ of habeas corpus prayed for is therefore denied.