858

STATE OF MISSOURI, at the Relation of LILLIAN FULLER, Relatrix, v. DR. ORR MULLINAX, Superintendent of State Hospital No. 2, St. Joseph, Missouri, Respondent, No. 44094—269 S. W. (2d) 72.

Court en Banc, June 14, 1954.

*Lawrence R. Brown, Robert B. Fizzell, Jr.*, and *John J. Fallon* for relatrix; *Stinson, Mag, Thomson, McEvers & Fizzell* of counsel.

*Elmore G. Crowe* and *Alfred M. Mansur* for respondent.

LEEDY, J.—This original proceeding in mandamus to compel the admission of a mentally ill individual as a patient in a state mental hospital has been brought as a test case to determine the constitutionality of a recently enacted statute which, although it authorizes the use in certain situations of a revamped and greatly modified form of judicial proceeding, introduces into our jurisprudence other new and radically different procedures governing the hospitalization of the

mentally ill. (H.B. 355, Laws '53, p. —; RSMo 1949, §§ 202.780-202.-870, VAMS.)

There is no dispute as to the facts. For present purposes the following statement will suffice: Relatrix's adult daughter, Esther Porter, a resident of Jackson County, is a mentally ill individual, as defined in the act. On Oct. 28, 1953, her hospitalization was applied for in writing by relatrix under the so-called "standard non-judicial procedure" provisions of § 6 of the act. It was accompanied by the required medical certification, and the latter having stated the belief that Esther was likely to injure herself or others if allowed to remain at liberty, was duly endorsed by the Judge of the Probate Court of Jackson County (Hon. Leslie A. Welch), the effect of which endorsement, under subsection 3 of § 6, was to authorize any health or police officer to take Esther into custody and transport her to State Hospital No. 2, the hospital designated in the application. Respondent, although conceding suitable accommodations were available, refused to admit Esther for the reason that he had been informed that the new act was unconstitutional and void.

The Attorney General had held certain cognate sections (RSMo 1949, § 202.610 and § 202.630, VAMS, governing admissions to Missouri State School) to be unconstitutional as in violation of the due process requirements of the Federal and Missouri Constitutions. For this reason, and others deemed sufficient because of the importance of the question involved, this court permitted the constitutionality of the new act to be raised by respondent, and presented for determination in this proceeding.

The act is patterned after a suggested or tentative draft of legislation dealing with the problem of commitment and hospitalization of the mentally ill, prepared in the Federal Security Agency by the National Institute of Mental Health and the Office of the General Counsel (Public Health Service Pub. No. 51, G.P.O. 1952), and herein referred to as the "draft act," which embodied the basic principles suggested in "The Mental Health Programs of the Forty-eight States," The Council of State Governments' Report to the Governors' Conference (1950). It would appear that Missouri is the first of the states to adopt the model act, although some of its features, in varying forms and degrees, can be identified as having been taken from statutes of other states. In adopting it our own legislature made changes, some of which will be hereinafter noticed. Some idea of the magnitude of the study and effort which has gone into the draft act may be gained by reference to recent law review articles on the subject, such as "Comments on a Draft Act for the Hospitalization of the Mentally Ill" by Charles W. Whitmore, M.D., (1950-51) 19 Geo. Wash. L.R., 512-530; "Hospitalization of the Mentally Ill" (which includes a discussion of the draft act, 859-863) by Henry Weihofen, Professor of Law, University of New Mexico, (1951-1952) 50 Mich. L.R., 837-872; "Hospitalization of

the Mentally Ill'' by Wm. J. Curran, Assistant Director, Institute of Government, Assistant Research Professor in Public Law and Government, University of North Carolina, (1953) 31 N.C. L.R., 274-298. See, also, ''Constitutionality of Nonjudicial Confinement,'' (Note, 1950) 3 Stanford L.R., 109.

As enacted by the 69th General Assembly, the new statute repealed 18 sections of Chapter 202, RSMo 1949, in relation to the hospitalization of insane persons, and enacted 28 new sections in lieu thereof. Unlike pre-existing legislation on the subject, private hospitals are included within the purview of the act. In briefest outline, its provisions are these: § 1 defines certain terms as used in the act. §§ 2, 3 and 4 authorize the voluntary hospitalization of a person who is mentally ill (defined by § 1 ▮▮▮ as ''an individual having a psychiatric or other disease which substantially impairs his mental health''), or who has symptoms of mental illness, and provide procedures for admission, release, etc., of such voluntarily hospitalized persons. § 5 authorizes, in the case of private hospitals, and enjoins upon public hospitals the duty of, receiving ''for observation, diagnosis, care and treatment'' any individual whose admission is applied for under any of four procedures (therein enumerated) for the involuntary hospitalization of the mentally ill, as follows:

1. On medical certification; standard non-judicial procedure;
2. On medical certification; emergency procedure;
3. Without endorsement or medical certification; emergency procedure;
4. On court order; judicial procedure.

The four procedures thus enumerated are respectively developed and detailed in §§ 6, 7, 8 and 9. § 10 has to do with the hospitalization by an agency of the United States of a person eligible therefor who has been ordered hospitalized under § 9, jurisdiction being retained in the appropriate court to at any time inquire into the mental condition of the person so hospitalized. § 11 deals with the matter of transporting mentally ill persons to hospitals and their detention pending removal. Post admission provisions are set out in §§ 12 to 18. They embrace such matters as notice of hospitalization, medical examination of newly admitted patients, transfer of patients, periodic examination and discharge, convalescent status, right to release and application for judicial determination, and reexamination of order of hospitalization. §§ 19 through 25, together with § 28, are provisions applicable to patients generally, such as the right to humane care and treatment, banning mechanical restraints, right to communication and visitation, exercise of civil rights, making the writ of habeas corpus available to any person so confined, prohibiting the disclosure of certain information, detention pending judicial determination, and imposing penalties for unwarranted hospitalization or denial of rights. §§ 26 and 27 are not to be found in the draft act. They represent

purely local adaptations, and are derived, in part, from repealed §§ 202.120, 202.270, 202.280, and 202.310, RSMo 1949 and VAMS. The effect of § 26(2) will be the subject of later comment.

The four grounds of attack here made upon the constitutionality of the act are as follows: (1) That in violation of Art. III, § 23, Const. of Mo., 1945, the subject of the bill is not clearly expressed in the title, and the bill embraces more than one subject; (2) that §§ 6, 7 and 8 permit Esther Porter and other citizens to be deprived of liberty without due process of law, in violation of Art. I, § 10, Const. of Mo., 1945, and the Fourteenth Amendment to the Const. of the U. S.; (3) that the act abolishes the right of trial by jury if demanded, in violation of Art. I, § 22(a), Const. of Mo., 1945; and (4) that it provides for the seizure and detention of a person under and by virtue of a written document not supported by oath or affirmation, in violation of Art. I, § 15, Const. of Mo., 1945.

The three sections challenged under (2) of the paragraph last above have to do with involuntary patients other than those hospitalized on court order under § 9. Such sections are, respectively, as follows:

### Section 6

"1. Any individual may be admitted to a hospital upon

"(1) Written application to the hospital by a friend, relative, spouse, or guardian of the individual, a health or public welfare officer, or the head of any institution in which such individual may be, and

"(2) Certification by two designated examiners that they have examined the individual and that they are of the opinion that

"(a) He is mentally ill, and

"(b) Because of his illness is likely to injure himself or others if allowed to remain at liberty, or

"(c) Is in need of care or treatment in a mental hospital, and because of his illness lacks sufficient insight or capacity to make responsible application therefor.

"2. The certification by the designated examiners may be made jointly or separately, and may be based on examination conducted jointly or separately, as the regulations of the division of mental diseases may prescribe. An individual with respect to whom such certification has been issued may not be admitted on the basis thereof at any time after the expiration of fifteen days after the date of examination exclusive of any period of temporary detention authorized under section 11.

"3. Such certification, if it states a belief that the individual is likely to injure himself or others if allowed to remain at liberty, shall, upon indorsement for such purpose by the head of the county welfare department or by a judge of any court of record of the county in which the individual is resident or present, authorize any health

or police officer to take the individual into custody and transport him to a hospital designated in the application.''

### Section 7

''1. Any individual may be admitted to a hospital upon

'' (1) Written application to the hospital by any health or police officer or any other person stating his belief that the individual is likely to cause injury to himself or others if not immediately restrained, and the grounds for such belief, and

'' (2) A certification by at least one licensed physician that he has examined the individual and is of the opinion that the individual is mentally ill and, because of his illness, is likely to injure himself or others if not immediately restrained.

''2. An individual with respect to whom such a certificate has been issued may not be admitted on the basis thereof at any time after the expiration of three days after the date of examination.

''3. Such a certificate, upon indorsement for such purpose by the head of the county welfare department or a judge of any court of record of the county in which the individual is present, shall authorize any health or police officer to take the individual into custody and transport him to a hospital as designated in the application.''

### Section 8

''Any health or police officer who has reason to believe that

'' (1) An individual is mentally ill and, because of his illness, is likely to injure himself or others if allowed to remain at liberty pending examination and certification by a licensed physician, or

'' (2) An individual who has been certified under section 6 or 7 as likely to injure himself or others and therefore cannot be allowed to remain at liberty pending the indorsement of the certificate as provided in those sections may take the individual into custody, apply to a hospital for his admission, and transport him thereto. The application for admission shall state the circumstances under which the individual was taken into custody and the reasons for the officer's belief.''

Relatrix characterizes the non-judicial procedures as the great innovation of the act, and § 6 as being perhaps the most important, in that they ''permit friends or relatives of those suffering from mental illness to apply for and receive for them skilled medical treatment without undergoing the ignominy of an appearance in open court or without having to suffer the stigma of a permanent record of formal adjudication of insanity.'' If the constitutional rights of such unfortunates are sufficiently safeguarded so as to satisfy the requirements of due process, then, of course, these beneficent purposes may be achieved, and the scheme of the act given effect. The question raised by respondent in this connection is that the act, under §§ 6, 7 and 8, permits citizens to be deprived of their liberty without notice, hearing or opportunity to defend on the question of their insanity or

mental illness, and for these reasons offends against the due process guaranties of the federal and state constitutions.

Both sides recognize that the state, in the exercise of the police power, may provide for the summary apprehension of an alleged insane person, dangerous to self or to others, and his temporary detention (without notice or hearing) until the truth of the charges can be investigated. In re Moynihan, 332 Mo. 1022, 62 S.W. 2d 410. Admittedly, under the procedures set up by §§ 6, 7 and 8, no provision is made for notice, hearing or an opportunity to defend. This omission is sought to be justified on the ground that the act authorizes only temporary detention in the absence of a judicial determination. This is asserted to be so because of the provisions of § 17 under which it is argued that to effect the release or secure a judicial determination of the mental condition of any patient hospitalized under §§ 6, 7 or 8 "he or someone on his behalf, need only demand his freedom and he is immediately granted a full hearing."

§ 17 reads as follows: "1. Any patient hospitalized under the provisions of sections 6, 7, or 8 of this act who requests to be released or whose release is requested, in writing, by his legal guardian, spouse, or adult next of kin shall be released within forty-eight hours after receipt of the request except that, upon application to the court or a judge thereof, whether in session or in vacation, suported by a certification by the head of the hospital that in his opinion such release would be unsafe for the patient or for others, release may be postponed for such period not to exceed five days as the court or a judge thereof may determine to be necessary for the commencement of proceedings for a judicial determination pursuant to section 9.

"2. The head of the hospital shall provide reasonable means and arrangements for informing involuntary patients of their right to release as provided in this section and for assisting them in making and presenting requests for release."

Relatrix places her principal reliance upon a line of cases from other jurisdictions upholding the constitutionality of statutes which did not require notice or an opportunity to be heard in advance of commitment where a later hearing was afforded either by a special statutory proceeding (not like that referred to in § 17 as provided by § 9), or by resort to habeas corpus. Hammon v. Hill (D. C. Pa.) 228 Fed. 999; In re Crosswell's Petition, 28 R.I. 137, 66 Atl. 55; In re Dowdell, 169 Mass. 387, 47 N.E. 1033; Ex parte Dagley, 35 Okla. 180, 128 Pac. 699. This view is directly contrary to our own cases. Hunt v. Searcy, 167 Mo. 158, 67 S.W. 206, declares that the constitutional requirement of due process made notice a necessary prerequisite to any judgment of insanity or otherwise which deprived the person of either liberty or property, whether such notice was by the statute made necessary or not. See, also, Ussery v. Haynes, 344 Mo. 530, 127 S.W. 2d 410; Shanklin v. Boyce, 275 Mo. 5, 204 S.W. 187; State

ex rel. Terry v. Holtkamp, 330 Mo. 608, 51 S.W. 2d 13; 44 C.J.S., Insane Persons, § 67(e); 28 Am. Jur., Insane and Other Incompetent Persons, § 32; Simon v. Craft, 182 U.S. 427, 21 S.Ct. 836, 45 L.Ed. 1165, 1170.

Moreover, the doctrine of later relief by habeas corpus as effectuating due process has been expressly repudiated by this court. In State ex rel. Kowats v. Arnold, 356 Mo. 661, 673, 204 S.W. 2d 254, 260, it was said: "The exercise of the power [to hold insanity inquisitions and issue commitments thereunder] may deprive the subject of precious constitutional rights, liberty and enjoyment of property, which cannot be done without due process of law. *And it will not do to say in such a case that relief can be obtained afterward by habeas corpus.*" (Emphasis supplied.)

In declining to follow the cases relied on by relatrix, mentioned above, and others of similar import, the United States Court of Appeals for the District of Columbia in Barry v. Hall, 98 Fed. 2d 222, 228, took the view that they were "wrongly decided."

It will be seen that admission to a mental hospital under the nonjudicial procedures here attacked could always result in indeterminate confinement. For example, under § 6 hospitalization in a private or public institution is effected upon the application of some third person (as in said section designated) and certification of two licensed physicians. This could be accomplished without the proposed patient's knowledge that impairment of his mental condition was even suspected. Then for want of subsequent action (however induced) on the patient's part, or in his behalf, as prescribed by § 17, such hospitalization might conceivably continue for the remainder of the patient's life. The same result could ensue under the more drastic emergency provisions of § 8 where all that is required to authorize a health or police officer taking a person into custody, applying to a hospital for his admission, and transporting him thereto is that such officer has reason to believe that the individual is mentally ill, and because of his illness is likely to injure himself or others if allowed to remain at liberty pending examination and certification by a licensed physician. We are clearly of the opinion, and so hold, that for the statute in operation to thus deprive a person of his liberty without an opportunity to be heard in advance of commitment, if he or those acting for him desire it, would constitute a denial of due process, and accordingly render the statute, in its present form, unconstitutional. No reason is advanced why appropriate provisions embodying this safeguard cannot be fitted into the present framework of the act.

 We disallow the contention that because there is no provision for a jury trial *in the probate court* under § 9 of the act (the judicial procedure section), it follows that the right of trial by jury, if demanded, has been abolished in violation of Art. I, § 22(a), Const. of Mo., 1945. If RSMo 1949, § 467.020, VAMS, as presently enacted,

fails to provide for the allowance of appeals from the probate court to the circuit court in proceedings under § 9, as respondent suggests, that omission can be easily remedied by an amendment so providing. The right of appeal to the circuit court carries with it the correlative right to demand a jury in that court, and this, under the holding of the Moynihan case, supra, would preserve any right that might exist to a jury trial.

Respondent invokes the provisions of Article I, § 15, Const. of Mo., 1945, as rendering the act invalid, the contention being that the medical certification, on the one hand, and the court order, on the other, serve the same purpose as a warrant to arrest or detain a person in any other case, and since they are not based on or supported by written oath or affirmation, they are in conflict with this constitutional provision. Such provision is the one interdicting *unreasonable* searches and seizures. The act does not purport to provide for warrants. We dismiss the matter with the observation that respondent has pointed to nothing unreasonable, within the meaning of this section, in the statutory procedures by which the mentally ill are to be hospitalized, and so obviously the contention should be disallowed.

The above views make it unnecessary to pass on the question of the sufficiency of the title of the act. However, we do call attention to a matter mentioned in the briefs, but not made the subject of specific attack, and that is the inclusion of § 26, the provisions of which are not to be found in the draft act. As earlier suggested, this was designed as a local adaptation. § 26(2) requires a full judicial hearing under § 9 as to the mental condition of any person admitted to a state hospital who is unable to pay for care and treatment. There is no such provision respecting those able to pay, and so the sub-section thereby introduced an unwarranted and discriminatory distinction between the rich and poor, and rendered meaningless and ineffective admissions of indigent persons under the non-judicial procedures of the act. The latter conclusion follows because of the necessity for court order imposed by subsection 2.

Because of the constitutional infirmity of the act hereinabove pointed out, the respondent's action in refusing to admit the proposed patient was justified. It follows that the alternative writ should be, and it is, quashed.

All concur except *Tipton, J.*, not sitting.