**David H. BOGART,
Plaintiff-Respondent,**

v.

**Bruce A. JACK, Defendant-Appellant.**

**No. WD 38272.**

Missouri Court of Appeals,
Western District.

April 7, 1987.

James R. Derting, Kansas City, for defendant-appellant.

Wm. N. Marshall, III, Grandview, for plaintiff-respondent.

Before PRITCHARD, P.J., and MANFORD and BERREY, JJ.

BERREY, Judge.

Plaintiff-respondent David H. Bogart filed a petition cast in two counts—the first count is for the alienation of his wife's affections; and the second is for criminal conversation with plaintiff's wife. The case was tried to a jury who returned a verdict in favor of respondent for $10,000 actual damages and $10,000 punitive damages on each count (total monetary award of $40,000) from which defendant-appellant Bruce Jack appeals.

Respondent married Donna E. Bogart in December 1979. A daughter, Dana Maureen Bogart, was born to the marriage on March 12, 1982. The Bogarts separated in August 1982 and were divorced on January 3, 1983.

Donna Bogart testified the marriage went well for the first nine months but thereafter respondent gave her little affection and did not communicate very much with her; she stated he was not interested in going out or spending time with her and watched too much television. In the fall of 1980, unbeknownst to respondent, Donna had sexual relations on several occasions with their mailman who was also a social acquaintance of her husband, respondent. Despite these difficulties, the Bogarts decided to try to have a child and Donna stopped taking her birth control pills in January 1981. Donna testified she hoped that a baby would make the marriage better.

On June 7, 1981, Donna, who was working as a registered nurse at the Park Lane Medical Center, met Bruce Jack (appellant herein) who was also married, at the hospital pharmacy. Appellant was working as a part-time pharmacist while attending UMKC Dental School. Donna Bogart and Bruce Jack began to develop a close relationship and, admittedly, had sexual relations for the first time on July 17, 1981.

Sometime in July, Donna had a pregnancy test and found she was pregnant. She testified conception took place in June 1981, while she and respondent were on a trip and that she was already pregnant at the time she first had relations with the appellant. Donna Bogart gave birth to a daughter, Dana Maureen, the following March 10.

The development as well as the extent of the Donna Bogart—Bruce Jack relationship was revealed at trial through eleven letters and one birthday card from appellant to Donna and one letter from Donna to appellant, read into evidence, and the testimony with regard to these communications. These letters were discovered by the respondent, David Bogart, at Donna Bogart's apartment on December 4, 1983, when he visited his infant daughter Dana. He testified he was doing household chores for Donna and when he swept under the bed he knocked over a shoe box containing the incriminating letters. He removed the letters from the apartment without her consent.

Without reproducing the letters in their entirety, we will attempt to extract pertinent portions of the letters which bear on the proof of plaintiff's case. In the only letter in evidence written by Donna to appellant, she describes her feelings for him as well as her confusion toward the situation: "I only have to be careful with my feelings for you, because I don't want to lose what I have with David now, but if I'm not careful, I could lose both of you in the end." (Exhibit 1.) Appellant confessed his love as "endless, tireless and given completely without reservation." He relates that he "already love[d] [Donna's] baby as if it were [his] own." (Exhibit 2.) A letter written in December 1981, speaks of their "secret meetings":

Now go to the desk at our Holiday Inn and ask for a message for you. I love you. I know that this is not one of your most favorite places that we have shared together, but it was here that we gave ourselves to each other for the first time and it was also here that we first told each other 'I love you.' It seems I haven't been able to say those three words enough ever since. I won't make you travel anywhere else. If I did, it would be to the racquetball court because it was there that I asked you to marry me. Come to my house now, I have something for you. I love you.

Appellant graduated from Dental School in May 1982, and moved to New Mexico in July 1982, to start his dental practice. In a letter dated August 10, 1982, he refers to himself as the "future husband and the one who loves [Donna] deeply," (Exhibit 5), and on August 14, 1982, he refers to Donna as the "future bride." He further states: "I can't wait to show you Albuquerque; to go looking at houses here together so we can start putting our dreams together and come up with the design that we both love—the way we want it together." (Exhibit 6.)

On September 10, 1982, appellant sent a birthday card to Dana Bogart in care of her mother and he expressed his dejection of not being with her. He stated he "miss[ed] the days the three of [them] used to share together" and hoped it wouldn't be long until they could share more of those days. He closed the birthday card with "Love 'Daddy' Bruce." (Exhibit 7.)

In October 1982, appellant came back to Missouri and spent a weekend with Donna and Dana Bogart in St. Joseph. The couple confirmed their love for one another, discussed wedding plans (Exhibit 8) and, according to Donna, had sexual relations. Throughout the fall of 1982, appellant continued to express his love to Donna (Exhibit 9, 10, and 11) but revealed signs of frustration with the realities of their situation: "I suppose there is an increased possibility that she [Mrs. Jack] will 'rape' me financially in any settlement as well as take my son away from me permanently."

On January 3, 1983, the Bogarts' dissolution of marriage was granted. Respondent testified he did not want the divorce and, at the time of their initial separation in August 1982, he did not know or understand why Donna wanted to leave. He stated upon learning of his wife's extramarital affairs he became sick and that knowing the extramarital relations took place beginning in July 1981, one month after his daughter was allegedly conceived, made him doubt the paternity of his daughter.

After hearing the evidence, the jury found for respondent on his claim of alienation of affections and criminal conversation. The jury assessed $10,000 actual damages and $10,000 punitive damages for his alienation of affections claim and $10,000 actual damages and $10,000 punitive damages for his criminal conversation claim. Bruce Jack appeals the judgment rendered on the verdict on the basis that (1) respondent's causes of action are outmoded and should be abolished; (2) it was trial error to admit the letters taken from Donna without her consent; (3) the damages were excessive and not based on any evidence appellant acted with legal malice; and (4) that the trial court lacked personal jurisdiction over appellant.

First, the abrogration of these two causes of action does not rest with this court. The Supreme Court of Missouri in *Gibson v. Frowein*, 400 S.W.2d 418, 421 (Mo. banc 1966), validated the existence of the intentional tort of alienation of affections in which a defendant's wrongful conduct causes a plaintiff's loss of the affections or consortium of his spouse. A person is presumed to intend the natural and probable consequences of his act in the action for alienation of affections. *Kraus v. Kraus*, 693 S.W.2d 869, 873 (Mo.App. 1985). Similarly in *Compte v. Blessing*, 381 S.W.2d 780, 788 (Mo.1964), the high court of this state reaffirmed the action for criminal conversation: the adulterous conduct of a defendant with a plaintiff's spouse. These decisions are controlling upon this court and to make such wholesale changes in the law are not only unwise but beyond the authority of this court. *Pitts v.*

*Malcolm Bliss Mental Health Center,* 521 S.W.2d 501, 503 (Mo.App.1975).

■ Secondly, we find appellant's argument that the letters are inadmissible in evidence because they were taken without his ex-wife's knowledge or consent and without legal process to be without merit. Appellant cites several cases from other jurisdictions which have found that evidence obtained through criminal means such as theft must be excluded on the rationale it is an unreasonable search and seizure. *Williams v. Williams,* 8 Ohio Misc. 156, 221 N.E.2d 622, 625 (1966). *See also Rickenbaker v. Rickenbaker,* 28 N.C. App. 644, 222 S.E.2d 463 (1976); *Markham v. Markham,* 272 So.2d 813 (Fla.1973); *White v. Longo,* 190 Neb. 703, 212 N.W.2d 84 (1973). This court, however, does not need to look at the law of other jurisdictions. This court in *Elliot v. Mid-Century Insurance Co.,* 701 S.W.2d 462, 465 (Mo. App.1985), held illegally seized evidence may be admitted in a private civil action. In *Elliot, supra,* homeowners brought an action for non-payment on a fire policy against their insurance carrier. The insurance company introduced evidence that the fire was deliberately set—evidence seized by a governmental authority without a warrant and without the homeowners' consent. This court stated "[b]ecause the exclusionary rule was intended to deter governmental and not private action, under the circumstances it cannot be said the evidence was improperly admitted." *Id.* at 465.

In the instant case we do not need to go so far as say to the exclusionary rule is controlling. Respondent, who obtained the letters from Donna in a stealthy manner, is not an arm of the government; he obtained and used the letters for his own purposes. Additionally, it was not appellant's privacy which was invaded but Donna Bogart's. The courts are not concerned with the manner by which a party obtains the evidence to support his contentions and the evidence will not be excluded because it has been obtained fraudulently, wrongfully or illegally if it is otherwise admissible. *Diener v. Mid-American Coaches, Inc.,* 378

S.W.2d 509, 511 (Mo.1964); *Herndon v. Albert,* 713 S.W.2d 46, 47 (Mo.App.1986).

■ Third, respondent's attack on the lack of legal malice to support the jury's punitive damage award is unjustified. To support a punitive damage recovery, the evidence must show that respondent's wrongful conduct was intentionally done without just cause or excuse. *Asher v. Broadway Valentine Center, Inc.,* 691 S.W.2d 478, 485 (Mo.App.1985). The evidence that appellant knew Donna was married and engaged in such conduct that was inherently wrongful, supported the submission of punitive damages as it supported the submission of the common law actions. *See Kraus v. Kraus, supra,* 693 S.W.2d at 873. Additionally, the excessiveness of the verdict is an issue which reviewing courts decline to undertake in cases such as this one. There is no scale upon which to gauge the compensatory damages on such actions and unless a flagrant abuse of power is shown, the verdict shall stand. *Id.,* at 874; *Smith v. Whalen,* 613 S.W.2d 868, 871 (Mo.App.1981).

■ Finally, appellant's allegation that sexual intercourse between consenting adults is not a tortious injury for the purposes of Missouri's long arm statute to acquire valid personal jurisdiction is groundless. Section 506.500.1(3) RSMo Supp.1984, states that a person submits himself to the jurisdiction of the courts of this state for a cause of action arising from the commission of a tortious act within this state. Appellant's wrongful conduct within this state gave rise to two well recognized torts: alienation of affections and criminal conversation. *See Gibson v. Frowein, supra,* 400 S.W.2d at 421 and *Smith v. Walen, supra,* 613 S.W.2d at 870.

Judgment affirmed.

All concur.