**In re the Matter of Craig MOORE.**

**Beverly Sue RYAN, Public Administrator of Clay County, Missouri, Respondent,**

v.

**Craig Edward MOORE, Appellant.**

**No. WD 48426.**

Missouri Court of Appeals, Western District.

Aug. 16, 1994.

Motion for Rehearing and/or Transfer to Supreme Court Denied Oct. 4, 1994.

Application to Transfer Denied Nov. 22, 1994.

Steven Petry, Gladstone, for appellant.

Timothy Flook, Liberty, for respondent.

Before LOWENSTEIN, P.J., and BERREY and SPINDEN, JJ.

SPINDEN, Judge.

Craig Moore appeals a jury's verdict finding him incapacitated and disabled and in need of a guardian and conservator. He contends the trial court erred by (1) admitting into evidence letters he had written, (2) allowing testimony and evidence regarding his prior involuntary civil commitment, and (3) allowing testimony about his refusal to discuss a mental health discharge plan with health professionals. Moore also asserts the trial court erred in overruling his motions for directed verdict and for judgment notwithstanding the verdict or, in the alternative, his motion for new trial. He contends that insufficient evidence supported the jury's verdict that he was incapacitated and disabled. We disagree with his contentions and affirm the trial court's judgment.

In 1984, Moore married and moved to Kansas City. About six months later, he divorced his wife. Moore was distraught

over the divorce and gradually became a recluse.

For a year, he attended a broadcasting school in Detroit, Michigan. When he returned to Kansas City, he got a job at a grocery store, rented an apartment, and owned a car. When his mother was transferred to Arizona because of her job, Moore moved into her house. He quit his job in June 1992. While living in his mother's house, Moore paid a neighbor boy to buy groceries for him.

In August 1992, Moore's mother, while still in Arizona, received a warning from city authorities that she would be fined if the grass at her Kansas City house was not mowed. She was unaware at that time of any problems her son may be having. She arranged for someone in Kansas City to mow the lawn, but when the person attempted to mow, Moore became irate. The police placed Moore in involuntary civil commitment at the Western Missouri Mental Health Center in Kansas City for 96 hours.

Moore's mother returned to Kansas City. She discovered that nearly all of Moore's personal belongings, including his furniture and car, were gone. She found no food in the house, and her son was "terribly skinny," having lost as much as 50 pounds since she had last seen him. Moore's mother decided to retire early so she could return to Kansas City to care for him.

After that, Moore rarely ventured from his room. He went out only to buy cigarettes about every three weeks. He expressed fear of the "mafia" and other evil forces.

Moore ate in his room and spent all of his time there working on what he called a "project." He would work endlessly for two or three days and nights, recording tapes. He would then sleep for two or three days. Moore's mother told the court:

[H]e's overseeing the media and the bad influences here in Kansas City. He does not read the Kansas City paper and, because it contains things that he believes is unhealthy out here. He believes that the Mafia is in control of the city.... And he, he thinks that the postal police are after him and that various other groups that are

trying to intimidate him and keep him from doing his work and sending his work off that he sends to the broadcasting school where he went to school in Detroit.... He makes these tapes and he puts them in an envelope and he puts stamps on them and puts them out in the mailbox to go. He's finding all his resources, he says. And this is what he believes that he's working. He believes he's working.

She said that he had never received any response to his letters.

Moore's mother told the court that she provided everything for Moore. She said:

I go to the store and I buy stamps for his little tapes that he sends off. I buy groceries for him, I put them in the house. And he, he'll cook an egg or bacon or something like that, but mainly I'll cook a dinner and just leave it. And he comes and eats and takes it in his room.

. . . .

[H]e eats whenever he's hungry, I may fix something at noon and he may not eat it until the nighttime.

She said that she attempted to get Social Security disability benefits for him, but he refused to cooperate because he believed that it was part of the Kansas City mafia. He also refused to submit to dental and eye exams.

Moore was able to count money and make change. He had no assets, bank accounts or bonds. His mother said, "He believes that he's gonna receive money for ... tapes that he's been sending off to Spec Howard Broadcasting School in Detroit, Michigan."

Moore's mother described her son as smart, eloquent, and able to discuss any subject "up to a superficial layer." She said, "He can talk on a superficial level, but he looses [sic] it after he gets down to basic things, like he believes that the radio and the T.V. are talking to him. I've discussed this with him[.] I said[,] ['T]hey don't talk to me.['] He said, ['Y]ou wouldn't understand if they did.[']" She said that he was exceptionally clean and cared for his own personal hygiene. He was capable of dressing him-

self, washing his clothes, and keeping his room clean.

In February 1993, Moore's mother signed papers requesting that Moore be committed to a mental health facility for observation and evaluation. Marita Kennedy, a mental health coordinator for the Missouri Department of Mental Health, attempted to interview Moore at home on February 24, 1993. Moore came out of his room for less than five minutes. He appeared to be angry and agitated and went back into his room and slammed the door.

Kennedy decided that Moore should be held at Trinity Lutheran Hospital for 96 hours as his mother requested. A judge ordered involuntary placement at the facility. The police took Moore to the hospital on March 1, 1993.

Moore told a social worker at Trinity that his previous involuntary commitment had interrupted his "research on changing bioms into miniature bioms." While at the hospital, he gradually withdrew and spent most of his time in his room. He eventually refused to interact with a social worker, a therapist, or other patients. He refused to discuss his plans concerning where to live and how to obtain food. He refused to discuss his problems.

A social worker decided that Moore would not be able to get a job, find shelter, or meet his health care needs. She said that Moore was almost paralyzed with fear, and added, "I don't believe that he can make decisions in his own behalf if his judgment is impaired. He might get himself into situations where he cannot get himself out of. He may not be able to interact with people in a logical, socially appropriate manner."

The social worker acknowledged, however, that Moore's case was difficult for her:

On one level he is quite articulate. I know that he's well educated. He can converse initially in a very apparently appropriate manner.... And his explanations for his actions appear in some ways to be logical[;] however, when one probes beneath the surface, it's apparent that he has some ideas that are not true. He bases his behavior and his actions on those ideas.... He's not obviously psychotic. He denied hearing voices. He denies having visual hallucinations. He's obviously under control physically. He does not argue excessively with people. So, on the surface he presents very well.

She believed that he would not be able to provide for his health, welfare and safety:

Based on the fact that he told me in frequent interviews that he felt that there was corruption in city government; that it was unsafe for him to remain in the city; that people were making threats against him, and so forth. And based on the fact that he refused to discuss with me any kind of lodging for post-hospital living. And that he could not tell me how he was going to meet his needs, in other words he couldn't tell me how he was going to get food. He couldn't tell me how he was gonna get shelter. Based on that, you know I feel that he cannot function.... I believe that Mr. Moore is a risk of either being exploited or harmed because of his mental condition. I'm not certain as to whether he would harm someone else.

Jose Menendez, a doctor of psychiatry at Trinity, diagnosed Moore as suffering a "delusional disorder." Referring to the Diagnostic and Statistical Manual of Mental Disorders, the doctor described the condition of delusional disorder:

"The essential feature of the disorder is the presence of a persistent nonbizarre delusion that is not due to any other mental disorders such as schizophrenia, schizophreniform disorder, or a mood disorder.

The diagnosis is made only when it cannot be established that an organic factor initiated and maintained the disturbance."

... "Apart from the delusion or its ramifications, behavior is not obviously odd or bizarre.

Auditory or visual hallucinations, if present, are not prominent."

. . . .

Very interestingly enough, social and marital functioning are often impaired. "A common characteristic of people with delusional disorder is the apparent normality of their behavior and appearance when

their delusional ideas are not being discussed or acted upon."

That is very important because a lot of these patients do present extremely well, very well, very well. Talk to them, there's no problem. However, once you dive underneath the crust, then you really start feeling the material that produces the symptomatology.

Menendez noted that Moore was totally unrealistic about his future after being discharged from the hospital. He explained:

He absolutely denied the need for medication, the need for the type of shelter, had no idea what he was going to do when he was discharged. How was he going to be able to get the food, the money, et. cetera. He didn't know, but he was going to go ahead and do it, he would do it, he would do it. Those were, that's what he would say.

He felt that Moore needed support and guidance and that he may not be able to adequately meet his own needs. He also believed that Moore needed medication to stabilize his condition. He indicated that Moore's entrenchment in the "delusional system" was very strong, and that the disorder would grow worse. He concluded:

At the last time that I saw him, the patient was not at a point where he could make appropriate decisions for his well being, both financial and otherwise, although his activities of daily living were adequate, his documented history also showed that he was not necessarily going to be able to follow through with those activities that would benefit him as far as his well being.

. . . .

[B]ecause of the fact that his thinking is delusional, and, consequently the delusions are things that are interjected into his activities of daily living as well as into his life in general, that sufficiently strong delusional system can exist that it would effect his action to the point, to the point that it could endanger his life, endanger his health, endanger his financial stability. And that is where the worry comes in. At least medically on my part.

While at Trinity, Moore bathed, dressed and fed himself, but he refused to take medication. Menendez recommended that a petition be filed to hold Moore for 21 days at the hospital. When Moore's mother agreed to let him come back home, Menendez decided to release him to his mother's care.

Moore's mother described Moore after he returned home from the hospital:

[H]e was very upset and he said he wanted to go outside and talk, although it was cold. So, we went outside to the back yard. . . . He, he felt that whatever he said in the house would be transmitted somewhere. . . . So, we went out in the back yard and he was telling me of his visit in Tri–County. . . . Well, he said that the social worker . . . was a nun. And that he really wasn't mentally upset, that all the people on the wards where it was a lockdown ward were mafia people, C.I.A., F.B.I., postal inspectors and Kansas City mobsters.

When she asked Moore about his plans for future living arrangements, Moore told her "things [were] fine with him, he need[ed] no care, he [would] take care of himself." When Moore's mother told him that she intended to sell her house and that he would have to move, Moore responded, "I'll take care of it."

Moore's mother left him alone at home for extended periods of time after he was released from Trinity. In March 1993, she was away on vacation for more than two weeks. Less than a month later, she went to Arizona. During that time, no one checked on or took care of Moore. Before leaving, she cooked dinners and put them in the freezer and stocked the house with food. When she returned, she noted that Moore had eaten the food.

A package which Moore mailed was returned to the house in March 1993 because it was damaged. His mother looked in the package and discovered letters and an audio tape. The letters were addressed to persons at the Spec Howard School of Broadcasting Arts in Michigan, Ted Turner at Cable News Network, and Paul McCartney. They discussed his work concerning "ground tolerance zero crime in the city" and asked for financial assistance for relocation to England

to continue working on the "communication systems of the State of United Nations." He also requested the individuals to "be in touch" with Steven Spielberg in Hollywood about his work.

On March 5, 1993, Moore's mother filed an application for appointment of guardian and conservator for her son. Moore requested that the case be heard by a jury, and, on May 26, 1993, the jury found Moore to be incapacitated, disabled, and in need of a guardian and conservator. The trial court entered its order appointing Moore's mother as guardian and conservator. On September 9, 1993, the trial court denied Moore's motion for judgment notwithstanding the verdict or, in the alternative, a motion for new trial. Moore filed his appeal with this court on September 23, 1993, and we remanded to the trial court for the limited purpose of appointing a new guardian and conservator. On December 27, 1993, the trial court appointed Beverly Sue Ryan, Public Administrator of Clay County.

In this appeal, Moore first contends that the trial court erred by admitting into evidence the letters Moore had written and sent to the broadcasting school in Detroit, Michigan. He asserts that his mother illegally obtained the letters since he had deposited the letters into the U.S. mail and the letters were not addressed to her. Moore contends that U.S. CONST. amend IV and MO. CONST. art. I, § 15 (1945), should have blocked admission of the letters into evidence. We disagree.

■■■ While the courts have, pursuant to these constitutional provisions, excluded illegally-obtained evidence, these provisions are not implicated in civil proceedings. These constitutional provisions are implicated only by governmental, not private, action. *Kimber v. Director of Revenue,* 817 S.W.2d 627, 631 (Mo.App.1991); *Elliott v. Mid–Century Insurance Company,* 701 S.W.2d 462, 465 (Mo.App.1985). Moore's mother was not a governmental actor. Further, although

§ 475.075.8, RSMo 1986, recognizes that an individual facing an application for guardianship and conservatorship has a liberty interest, criminal evidence rules are not necessary to protect that interest. In civil cases, the manner in which evidence is obtained is irrelevant to the issue of admissibility. Even evidence obtained fraudulently, wrongfully, or illegally is admissible. *Bogart v. Jack,* 727 S.W.2d 447, 450 (Mo.App.1987); *Herndon v. Albert,* 713 S.W.2d 46, 47 (Mo.App.1986). The trial court did not err in admitting the letters into evidence.

Moore next contends that the trial court erred by admitting into evidence testimony relating to his prior hospitalizations and involuntary civil commitments. Moore asserts that he was not given the opportunity to contest the allegations contained in the applications for civil commitments and that the testimony regarding the prior involuntary civil commitments violated the physician-patient or psychologist-patient privilege.

Moore claims that the *ex parte* involuntary civil commitments hearings denied him the right to be heard and denied him due process of law. He points out that the prior statutes, §§ 202.780 to 202.870, RSMo 1949, were held unconstitutional as a violation of due process because individuals were not given an opportunity to be heard before being committed to a mental health facility. *See State ex rel. Fuller v. Mullinax,* 364 Mo. 858, 269 S.W.2d 72 (1954). We reject this contention for the same reason we rejected Moore's first point.

■■■ As for his contention that the evidence violated the physician-patient and psychologist-patient privilege protected by § 632.425, RSMo 1986, he raises the issue for the first time on appeal, and, therefore, asks for plain error review pursuant to Rule 84.13. Plain error is evident, obvious and clear error. *State v. Bailey,* 839 S.W.2d 657, 661 (Mo.App.1992). In light of § 475.075.6, RSMo 1986,[1] we do not discern such error in this case.

---

1. That statute says, "If prima facie proof of partial or complete incapacity or disability is made, a physician or licensed psychologist is competent and may be compelled to testify as to information acquired from the respondent, despite otherwise applicable testimonial privileges. Evidence received under this subsection which would otherwise be privileged may not be used in any other civil action or criminal proceeding without the consent of the holder of the privilege."

■ A *prima facie* case of Moore's incapacity and disability was established by his mother's testimony and others. Thus, Moore's physician could be compelled to testify pursuant to § 475.075.6. Hence, we conclude that the trial court did not commit plain error in allowing testimony regarding Moore's prior involuntary civil commitments and in admitting Moore's medical records into evidence.

■ In his third point, Moore contends that the trial court committed plain error in admitting into evidence the testimony regarding Moore's refusal to cooperate with hospital personnel in preparing a discharge plan. He asserts that this was a violation of his right to remain silent pursuant to § 632.325 and § 475.075.8(5), RSMo 1986. Again, we fail to discern evident, obvious and clear error.

Moore was advised of his right to remain silent at the time of his involuntary civil commitment in March 1992. He claims that he was exercising his right to remain silent when he refused to discuss a discharge plan at Trinity. Moore, however, waived any right he had to remain silent at the time of the civil commitment by discussing his mental condition. Any statements he made to personnel at the mental health facility may be used against him at a court hearing. Section 632.325. His refusal to speak, therefore, was part of the admissible conversations.[2]

Moore made several statements about his prior civil commitment to Trinity personnel. He told them that he believed that because of corruption in city government he was not safe in Kansas City and that people had threatened him. Moore knew that his mother had requested the involuntary commitment and knew that she was not going to allow him to return to live in her home until he received therapy. Menendez concluded that Moore's "guarded, suspicious behavior and refusal to discuss or make a statement as to his discharge plan" was consistent with a diagnosis of "delusional disorder." We conclude Moore's refusal to discuss his future plans was directly related to his prior statements, and, therefore, was admissible.

Moore's final contention of error is that the trial court erred in overruling his motion for directed verdict, his motion for judgment notwithstanding the verdict or, in the alternative, his motion for new trial. He asserts that clear and convincing evidence did not exist proving that he was incapacitated or disabled. We disagree.

Clear and convincing evidence is evidence " 'which clearly convinces the fact finder of the truth of the proposition to be proved.' " *Selby v. Scott*, 859 S.W.2d 898, 901 (Mo.App. 1993) (citation omitted). Section 475.010(8), RSMo 1986, defines an incapacitated person:

> [O]ne who is unable by reason of any physical or mental condition to receive and evaluate information or to communicate decisions to such an extent that he lacks capacity to meet essential requirements for food, clothing, shelter, safety or other care such that serious physical injury, illness, or disease is likely to occur.

Section 475.010(4), RSMo 1986, defines a disabled person as one who is "[u]nable by reason of any physical or mental condition to receive and evaluate information or to communicate decisions to such an extent that the person lacks the ability to manage his financial resources." We conclude that sufficient evidence supported the jury's verdict that Moore was incapacitated and disabled.

Moore asserts that because the evidence of the letters he wrote, the prior involuntary civil detentions, the medical testimony, and his refusal to discuss his plans upon discharge should not have been admitted, insufficient evidence supported the jury's verdict that he was incapacitated. We have concluded, however, that the evidence was admissible. Moore's contention is without merit.

■ Further, substantial evidence existed to support the jury's finding that Moore was disabled. Moore's mother testified that when she returned from Arizona virtually all Moore's personal belongings were gone, in-

---

2. We can find no cases regarding the admissibility of statements and the right to remain silent when an individual is involuntarily subjected to a civil commitment. Thus, we use analogous criminal cases regarding the admissibility of an accused's statements. See *State v. Crow*, 728 S.W.2d 229, 230 (Mo.App.1987); *State v. Weicht*, 835 S.W.2d 485, 487 (Mo.App.1992).

cluding his car. She also testified that although Moore understood the concept of money, his mental condition was such that he would not leave home to obtain employment or even to obtain disability benefits. Moore was too afraid to go outside because of "the mafia" and other feared forces. According to his mother, Moore believed he was working by sending tapes to Ted Turner and C.N.N. A social worker testified that he was a likely candidate for exploitation and was almost paralyzed by fear of everything that he perceived to be going on in the community. Such evidence was sufficient for the jury to conclude that Moore was disabled.

The judgment of the trial court is affirmed.

All concur.